UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

U.S. DISTRICT COURT – N.D. OF N.Y.
**FILED**
**May 20 - 2024**
John M. Domurad, Clerk

Angelo Baez

Plaintiff(s),

**COMPLAINT**
(Pro Se Prisoner)

v.

City of Ithaca N.Y. police Dept.
investigators/officers

**Case No.** 9:23-CV-01512-LEK-ML
(Assigned by Clerk's
Office upon filing)

The Tioga county District Attorney
office.    Defendant(s).

**Jury Demand**
☒ Yes
☐ No

---

**NOTICE**

The public can access electronic court files. For privacy and security reasons,
papers filed with the court should therefore **not** contain: an individual's social
security number, taxpayer identification number, or birth date; the name of a
person known to be a minor; or a financial account number. A filing may
include *only*: the last four digits of a social security number or taxpayer-
identification number; the year of an individual's birth; a minor's initials; and the
last four digits of a financial account number. *See* Fed. R. Civ. P. 5.2.

---

I.  **LEGAL BASIS FOR COMPLAINT**

This is a civil action seeking relief and/or damages to defend and protect the
rights guaranteed by the Constitution and laws of the United States. Indicate
below the federal basis for your claims.

☒ 42 U.S.C. § 1983 (state, county, or municipal defendants)
☐ *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971)
   (federal defendants)
☐ Other (please specify) _____

II.   PLAINTIFF(S) INFORMATION

Name: _Angelo Baez_

Prisoner ID #: _548960_

Place of detention: _Broome County Correctional facility_

Address: _P.O. Box 2047_

_Binghamton, N.Y. 13902_

Indicate your confinement status when the alleged wrongdoing occurred:

- ☒ Pretrial detainee
- ☐ Civilly committed detainee
- ☐ Convicted and sentenced state prisoner
- ☐ Convicted and sentenced federal prisoner
- ☐ Immigration detainee

Provide any other names by which you are or have been known and any other identification numbers associated with prior periods of incarceration:

If there are additional plaintiffs, each person must provide all of the information requested in this section and must sign the complaint; additional sheets of paper may be used and attached to this complaint.

III.   DEFENDANT(S) INFORMATION

Defendant No. 1:   _Bambino    unknown First name_
Name (Last, First)

_Investigator_
Job Title

_NeYork State police_
Work Address

_Ithaca_        _NY_       _14850_
City              State      Zip Code

Defendant No. 2:   _Andrews Tocheny_
Name (Last, First)

_Investigator_
Job Title

2

New York State police
Work Address

Ithaca            NY            14850
City              State         Zip Code

Defendant No. 3:  Malysa Julie
                  Name (Last, First)

Investigator
Job Title

New York State Police
Work Address

Ithaca            NY            14850
City              State         Zip Code

Defendant No. 4:  Jaco Allard Jacob
                  Name (Last, First)

Investigator
Job Title

New York State Police
Work Address

Ithaca            NY            14850
City              State         Zip Code

If there are additional defendants, the information requested in this section must be provided for each person; additional sheets of paper may be used and attached to this complaint.

## IV.   STATEMENT OF FACTS

State briefly and concisely the facts supporting your claims. Describe the events in the order they happened. Your statement of facts should include the following:

- The date(s) on which the events occurred
- Where these events took place (identify the facility and, if relevant, the specific location in the facility)

3

Defendant No. 5:
 Buck Benjamin
 Investigator
 New York state police
 Ithaca N.Y. 14850

Defendant No. 6:
 Haff Dana
 Investigator
 New York state police
 Ithaca N.Y. 14850

Defendant No. 7:
 Schweiger Matthew
 Investigator
 New York state police
 Ithaca N.Y. 14850

Defendant No. 8:
 Martin Kirk
 District Attorney
 Tioga County

Defendant No. 9:
 Reardon Lily
 Assistant District Attorney
 Tioga County

* How each defendant was involved in the conduct you are complaining about

If you were physically injured by the alleged misconduct, describe the nature of your injuries and the medical evaluation and treatment you were provided. You need not cite to case law or statutes or provide legal argument in the Statement of Facts. Use additional sheets of paper if necessary.

Please refer to my use of my additional sheets after this page.

Please and thank you.

# V. STATEMENT OF CLAIM(S)

State briefly and concisely the constitutional and/or statutory basis for each claim you seek to assert and identify the defendant(s) against whom each claim is

4

United States District Court

Northern District of New York

Angelo Baez
                    Plaintiff(s)
          v.

City of Ithaca New York
police Department officers/
Investigators, the Tioga
County District attorney
and the assistant District
attorney of the Tioga County
                    Defendant(s)

Complaint
(pro se prisoner)

Case No. _____

Jury Demand
☒ yes
☐ No

These Claims and action is against
the City of Ithaca New York police
department officers/Investigators, the
District attorney and the assistant
District attorney of the Tioga County.

Investigator Bambino who took the first
statement of Robert Hines.
Investigator Andrew Tockeny who filed
the felony complaint and issued a warrant
for my arrest.
Investigator Julie Malysa who arrested
me.
Jacob Allard, Benjamin Buck, Dana Hoff,
Matthew Schweiger who were also
part of the investigation to my case.

Investigator Bambino is the officer
who took the sworn and signed
statement of Robert Hines to
where Robert Hines states on exhibit #3
page 3, 4th paragraph "Angel stayed
near the passenger side door, and Johnny
took the male out of the back seat.
and that when the male started to
run towards the ditch he heard a
a gun shot and the male fell down.
He looked in the mirror and he saw
Johnny holding what appeared to be a
silver semi-auto handgun, and that
after the first shot, Johnny took a few
steps towards the male and shot him
several more times with the handgun;
after that happened Johnny put the hand
gun away and then brought up the
shotgun and shot the male twice
with it, the second shot hit the
male in the head and completely
destroyed his head.

In this statement Robert Hines
never said anything about me having
a gun, using a gun or shooting a gun
But Investigator Andrew Tocheny
filed a felony complaint against
me with having committed the
felony of murder in the second

degree, in violation of Section 125.25 Subsection 1 of the penal law of the State of New York, Affirmed and Signed under penalty perjury on the 23 day of August 2023.

Investigator Andrew Tocheny's felony complaint against me Claims that for a fact that on or about the 21st day of may, 2023 in the town of Candor, County of Tioga, I did unlawfully Commit the felony of murder in the second degree by Individually and while acting in Concert with others, Intentionally Cause the death of Thomas Rath by Shooting him with a handgun and shotgun.

Investigator Andrew Tocheny Knew or Should have Known that there was a police report of Robert Hines's statement to investigator Bambino that States that John Glennon was the only shooter of both handgun and shotgun that took the life of Thomas Rath.

The exclusion of Robert Hines's first statement taken by Investigator Bambino deprived me of some of the most persuasive evidence there was to offer of my innocence to the charge of me murdering Thomas Rath.

The Investigators on this case and prosecutors ignored how fundamental that deprivation was, and my indictment resulted only in a decision that that was based on an unreasonable determination of the facts in light of the evidence presented to the grand jury and judge. Evidence rendered my indictment fundamentally unfair and violated my Constitutional Rights. If such evidence was submitted, the people would not have met their burden to prove beyond a reasonable doubt that I was the one that murdered the victim.

Proving How extulpatory it
Would be to a jury, if this
police statement made by Robert
Hines to investigator Bambino
Would have proven that I did
not shoot or murder Thomas
Rath, But instead the Court,
Concluded that the Government
presented sufficient evidence to
prove the elements of each count
of indictment beyond a reasonable
doubt.

The prosecution then
Committed purjury and fraud after I
was indicted, When in his responce
to my affirmation of Omnibus
motion (motion to dismiss indictment)
he lies and states that a witness
by the name of Justin Knapp
stated that while on the phone
with Joe Howell I was assulting
and restraining Thomas Rath, When in fact
he never mad that statement.
The prosecution although
stating this, Knew this because at
the grand jury proceeding, Where he

was Present, a Juror asked Justin Knapp where it was that Thomas Rath was assulted and restrained?

Justin Knapp responded by telling the juror that he did not know because it all happened befor he got there.

The prosecutor also tries to insinuate that I had part in digging a hole and burrying Thomas Raths body knowing that Robert Hines already stated that he dug the hole and burried Thomas Ratt on his own and by himself.

So the prosecution providing misleading statements, falsification and Concealment of documents at the grand jury proceeding and for entering false statements in Connection with his responce to my affirmation of omnibus motion (motion to dismiss indictment) This evidence makes a fact

More or less probable than it
would be without the evidence
and which is a fact of the
matter in determining the action,
proof being introduced sufficient
to support a finding that the
fact does exist.

It stands to reason that
the grand jury proceedings that
lead to my indictment were
similarly flawed.

The witnesses that testified
and are testifying and using
changed statements and/or are
purgurying are cooperating for
their own preservation, so
these witnesses conjoled and coerced
testimony/statements should be
barred or should of have been barred
because witness's concealed
statements like that of Robert
Hines prove that I was not
the shooter or the person who
Comanded the kidnapping or murder
of Thomas Rath.

I was implicated of
possesing and shooting the fire

Arms that took the life of Thomas Rath by John Glennon the shooter and murderer himself who lied to Investigators and said he wasn't even there.

And now by Robert Hines at the jury proceeding, to where his testimony to the jury and Judge was that John Glennon and I both shot Thomas Rath with two different handguns and then Glennon finishing him off by shooting Rath with the shotgun two times.

Once again if such evidence (Robert Hines's statement) was submitted, the people would not have met their burden to prove beyond a reasonable doubt that I was the one that shot and murdered the victim Thomas Rath.

My evidence proves that there was Malicious prosecution introduced into my case, and that it lead to my indictment.

Since a person is not an
accomplice just because he
is present at the scene of a
crime, even if he knows that a
crime will be comitted,
(To which I did not)
or being comitted and does nothing
to stop it, prosecutors had to
(but did not) prove accomplice
corroboration by evidence, to
where there was never no real
evidence beyond a reasonable
doubt that I ever even intended
or ever did aid, facilitate, promote,
encourage, or instigate the
Commision of the crime or
participate in a criminal
conspiracy to comitt the crime.

I ast how is it that I
even got charged with the crime
at hand?
All these Investigators
knew or should have known
about Robert Henes's first statement
did not intervene from stoping an
innocent man from going to jail,

being falsly indicted and
awaiting a date for a trial to
Comence.

the Combined efforts
by the Investigator who filed
the felony Complaints
against me and issued a Warrent
for my arrest, along with
the prosecutors resulted
in a false and Coerced
statement by Robert Hines
Which was eventually
presented to the grand jury
to obtain an indictment
against me.
Because of this
fabricated evidence...
Was the reason the
prosecutors made me a
suspect in the murder of
Thomas Rath.
Infact all Defendant
investigators knew about
the problems and inconsistencies
of other witnesses along with
the Confessions by Robert Hines

and worked in Concert with the District attorney office to nonetheless pergue the Case by selectively presenting evidence to the jury and judge inorder to get my indictment.

There is also general lack of forensic evidence related to me, and while in my own words indicate I was, at minimum a witness to the murder.

Mr. Hines was coerced to give a new statement at the grand jury proceedings which induced him to say that I to shot Thomas Kath with a second handgun, instead of what he stated in his first statement to investigator Bambino. The prosecutors knew or should have known that Robert Hines new statement were false, and the false evidence/Confessions were

the evidence, along with
other fabricated evidence
by which the prosecution
obtained the indictment
against me.

The prosecution then
pursued Criminal Charges
against me knowing he
lacked probable cause.
It should have been
obvious to all the defendants
that Robert Hiner's new
statement were untrue...
Because,
Mr Hines changed his statement
to Comform with the facts
that were fed to him by
the prosecutors.

This is also because Mr Hines
Changed his statement in
response to promisses of
leniency made to him by the
prosecutors and of his release
from jail as well.

## First Claim:

Fifth amendment Violation.

## Second Claim:

Sixth amendment Violation.

## Third Claim:

Eighth amendment violation

## Fourth Claim:

14th amendment violation.

## Fifth Claim:

Brady Rights violation

## Sixth Claim:

Malicious prosecution
(fabricated evidence)

Seventh Claim:

Due Process violation.

Eighth Claim:

Municipal liability Claim

Nineth Claim:

Malicious prosecution
(presenting false statements/
withholding exculpatory
information)

Tenth Claim:

Malicious prosecution, (lack of
Probable Cause Claim.)

Eleventh Claim:

§ 1983 Claim of Malicious prosecution
(for being falsely arrested and
of false imprisonment.)

## Twelfth Claim:

§ 1983 Failure to intervene.

## last Claim:

Innocent person Claim.

## — Relief Requested —

Monetary Damages of $1 Million for emotional distress damages under 11 U.S.C.S § 362(k). and against the state/federal officials in their individual Capacitities. And any other Monetary Damages I am intital to... Also to be cleared of the charges against me along with being released from jail...

I declare under penalty of perjury that the foregoing is true and correct.

5/16/24

X Angelo Baez
X Angelo Baez.

EXHIBIT 1

Pg. 1 oF 5

testimonies thereof, which have been already provided, to the defendant. There was nothing unusual about the evidence submitted to the Grand Jury where the Court would need defense counsel's aid in making its determination regarding the motion to dismiss the indictment. It is the People's position that the evidence presented to the Grand Jury was more than legally sufficient to support the charges contained in the indictment and that the legal instructions given to the Grand Jury were proper. The witness minutes have already been provided to the defendant and the defendant does not need the instructions in order to assist them in preparing for trial. Moreover, a release of the grand jury minutes would not be in the public interest. [CPL Article 210].

## **DISMISSAL/REDUCTION OF INDICTMENT**

3. The People oppose a dismissal or reduction of the Indictment.

4. The indictment is not defective and is sufficient on its face, the evidence presented to the Grand Jury was legally sufficient to support all the charges contained in the indictment, the grand jury proceeding was not defective, and there is no additional basis on which the indictment should be dismissed or reduced pursuant to CPL Article 210.

5. There was evidence presented from multiple witnesses that, put together, provided overwhelming evidence Baez willingly acted at Howell's direction and on his own volition both as a principal and/or accomplice, of the kidnapping, torture and events that lead to Rath's death and provided abundant reasonable cause to establish the offenses set forth in the indictment. [CPL 70.10]. Specifically, evidence, including but not limited to the following, was presented:

a. Justin Knapp testified that he did work for Howell and that Howell paid him in money and drugs, that he spoke directly to Howell on the phone from the Jungle as Baez was assaulting and restraining Rath, and that

In Knapps
Jury mins.
Knapp never states
that I assulted or
restrained Rath.
Knapp in fact states that Rath was assulted and restrained
Befor he even got there when asked By one of the jurors
asked Knapp Did he see How or when Rath was handcuffed.

EXHIBIT #1

As stated in
Justin Knapp's
Jury mins.
Knapp was already
waiting for Howell
and was told to get
in car so that he
can bring the tools
to sell to you.

Howell asked him to assist Dillon and Baez and that as a result of this conversation he assisted Baez in escorting Rath from the Jungle in handcuffs and into a car, which drove to Benjamin Hill Road where Howell pulled Rath out of the back of the SUV and kicked him and took him into the house/garage area and that Howell gave him a ride back to Ithaca and told him to never mention Rath.

b.   Jack Benjamin testified Howell asked him to come up that night and when there he was summoned into the garage where Howell had Rath on the floor after he had been abused and he was scraping a hatchet across his head, and offered the hatchet to him, and in the garage were not only Howell but Baez, Glennon and Maycumber.   Joe Howell

c.   Robert Hines testified that he worked for the/defendant and when he arrived at Benjamin Hill Road the defendant paid him gas money to take co-defendants Baez and Glennon in his truck, and when he got into the truck the victim was in the back too, and that he drove them to Ekroos Road where Baez said "he had to go," meaning Rath had to be killed, and the victim was eventually shot and killed by both Baez and Glennon.

d.   Christine Linderberry testified that she received a picture message from
He's talking
About Joe   the defendant that showed someone tied up, face down with an object in
Howell    his anus, and that she needed to get a hold of Brelynn, that later on the "boys", which included the defendant were talking about robbing Steven Parks house, and that after Baez and Glennon had returned after killing

Exhibit # 1

*[handwritten left margin:]*
D.A. Kirk Martin already knew that Robert Hines Confessed to Digging the whole and e. Burrying Raths Body on his Own By himself.

When he → f.
Says defendant From Here on, He's talking g. about Joe Howell, and Not Me...

Rath, Howell told her if she said one word he would tie her up and kill her

family in front of her.                    *[handwritten:]* Joe Howell

Neraida Sobrado-Torres testified that the defendant was her boss or plug
for drugs, assaulted her after the incident and asked those present *[handwritten:]* ??? Why make
including Baez, if they were ready to dig "another hole" again.  *[handwritten:]* that statement

f.   Tammy Vorrasi testified that she received a message from the defendant
     asking her if she wanted to say anything to "this piece of shit," and she
     saw Rath tied up on the ground.

g.   Brelynn Vorrasi testified to having miscarried the defendant's baby, that
     the defendant blamed Rath for that, that the defendant had green lit them
     and had them beat up and they were told to leave town, and that the
     defendant sent her a message telling her Rath had moved out of town and
     she would probably never see him again.

h.   Antonio Morrow testified to receiving communication from Howell that
     contained a video of him walking to Rath, who he had tied up on the floor
     bound with duct tape and who had feces around him, that the defendant
     threatened him at Jack Benjamin's house later with a pistol and told him
     he better not be making any statements against him or he would see that
     gun again.

6. Further, the People submit that the evidence presented to the grand jury more than
adequately satisfied the standard for upholding an indictment, where on a motion to dismiss the
court must review the grand jury evidence in the light most favorable to the prosecution. Indeed,

*[handwritten:]* Now if the Court reviewed the Grand Jury evidence
Why is DA. Kirk Martin making these false
Statement on his Response to my Affirmation?

courts have found the evidence need not even provide reasonable cause "to believe that the defendant committed the crime charged." People v. Mikuszewski, 73 NY2d 407 (1989).

## STATEMENTS – HUNTLEY HEARING

7.  The People's submit that all statements from the defendant to law enforcement personnel were voluntarily made, and properly noticed. As such, the People oppose any limitation on any statements made by the defendant contained, referenced in or summarized by the 710.30.

8.  However, the People do not oppose a Huntley hearing in order to determine whether the defendant's statements contained, referenced or summarized in the 710.30, were lawfully obtained and thereby admissible at trial. The People will provide the Court with copies of all recorded interviews, which the People submit are admissible, at the Huntley hearing so that the Court can independently watch and listen to them.

## SANDOVAL/ VENTIMIGLIA/MOLINEUX

9.  The People oppose any blanket prohibition against such applications.

10. However, the People do not oppose the Court conducting a Sandoval hearing at the appropriate time, the Court's convenience with sufficient notice to the People, or within the week prior to trial. Should the defendant testify at trial, the People seek permission to cross examine him about the following convictions:

   a.  December 123, 2011, conviction for Attempted Robbery in the Second Degree:
       Motor Vehicle, PL 160.10(3), a class D felony for which he was sentenced to 3 years
       in state prison, was released on parole on Mary 28, 2014, revoked on July 13, 2015
       and released to parole on May 4, 2017.

**FURTHER MOTIONS**

16. The People do not oppose defendant filing further motions where legal issues arise based on newly discovered facts unavailable or unknown to the defendant prior to this current Motion.

WHEREFORE, the People respectfully request that the defendant's motions in all other respects be denied, together with such other and further relief as the Court deems just and proper.

Respectfully submitted,

KIRK O. MARTIN
District Attorney

DATED: February 7, 2024
       Owego, New York

TO:   Amanda Kelly, Esq.

      Hon. Adam R. Schumacher

      Tioga County Court Clerk

80

Examination of Justin Knapp

1       Q.    Yes.

2       A.    Yeah.

3       Q.    Did Joseph Howell tell Thomas to leave town

4   or something like that, or what had happened?

5       A.    I don't know.  It was just hearsay that I

6   know of.

7                   MR. MARTIN:   Okay.  That's all

8               right.

9                   Then I would just ask the grand

10              jury to disregard any comments that he had

11              about that.

12      Q.    Did Thomas leave town after that event?

13      A.    I know he wasn't around for like a month.

14      Q.    Okay.  I'm going to refer you to May 20th of

15  2023.  Were you down in the Jungle that day?

16      A.    Yeah.

17      Q.    Okay.  And at some point in time did Angelo

18  Baez talk to you?

19      A.    Yeah.

20      Q.    Okay.  And what did he say to you?

21      A.    I -- I don't remember exactly.  I was waiting

22  for Joe to show up, and we just stood there having a

23  conversation.  I don't know exactly about what because,

24  you know, I was under the influence of a lot of drugs,

Examination of Justin Knapp

1    but I'm pretty sure that's when he handed me the phone.

2         Q.   Who was on the other side of the phone?

3         A.   Joe.

4         Q.   Did you recognize his voice?

5         A.   Yeah.

6         Q.   What did Joe ask you to do, if anything?

7         A.   Come to the house with Angelo and Colleen.

8         Q.   Okay.  And so, what did you do next?

9         A.   Walked with Thomas and Joe -- I mean Thomas

10   and Angelo and got in a vehicle.

11                   MR. MARTIN:   Okay.  And I'm going

12              to ask you to just consider the comments

13              from Mr. Howell as it applies only to then

14              what this witness did after that as a result

15              of being on the phone and recognizing his

16              voice, okay.

17        Q.   And then was Thomas restrained or handcuffed

18   in any way at that point in time?

19        A.   Yeah.

20        Q.   And so, you said you got in a vehicle, and

21   was there any females in the vehicle?

22        A.   Two.

23        Q.   And were they in the front seats?

24        A.   Yes.

Examination of Justin Knapp

1        Q.    Did you recognize the driver?

2        A.    No.

3        Q.    Did you recognize the passenger, female?

4        A.    Yes.

5        Q.    Who was that?

6        A.    Colleen.

7        Q.    That's Joe Howell's girlfriend?

8        A.    Yes, sir.

9        Q.    And where was Thomas placed inside the

10   vehicle?

11       A.    In the way back where the hatch was.

12       Q.    Was it an SUV?

13       A.    Yes.  A smaller SUV, yeah.

14       Q.    And so, he was placed in the cargo area?

15       A.    Yes.

16       Q.    Was there a third-row seat there, or was it

17   just the cargo area?

18       A.    Just the cargo area.

19       Q.    And he was in handcuffs?

20       A.    Yeah.  I -- I don't know what restraint he

21   was in, but he -- either handcuffs or zip ties.

22       Q.    Okay.  Now, did you and Angelo get in the

23   car, as well?

24       A.    Yeah.

Examination of Justin Knapp

1        Q.    Then did the car leave?

2        A.    Yeah.

3        Q.    Where did the car drive to?

4        A.    Joe's house.

5        Q.    Okay.  Where did the car pull up to when they

6    got to the house?

7        A.    Around the back of the house.

8        Q.    Okay.  Was there a driveway around the back

9    of the house, or did they drive through the yard or

10   just drive up to the back?

11       A.    They just drove through the yard and out

12   back.

13       Q.    And who did you see there at the house at

14   that point in time when you -- when the vehicle drove

15   up?  Who was already at the house, if anybody?

16       A.    Nobody that I seen until I went inside.

17       Q.    Okay.  Who did you see when you went inside?

18       A.    John was there.

19       Q.    Is that Glennon?

20       A.    Yeah.

21       Q.    Okay.  Now, when the car pulled up to behind

22   the house, what happened to Thomas, if anything, if you

23   recall?

24       A.    Oh, excuse me.  Joe was at the house.  He

84

Examination of Justin Knapp

1    came outside through the back door.  They opened the
2    hatch and pulled Thomas out of the vehicle on the
3    ground.

4         Q.    And then what happened?

5         A.    I'm pretty sure that Joe had kicked him in
6    the head.  At this point myself walked inside because I
7    didn't want no part of it.

8         Q.    Okay.  And you saw Jonathan Glennon at that
9    point?

10        A.    Yeah.  He was inside in the living room.

11        Q.    Okay.  And then you walked in.  Where did
12   Jonathan Glennon go, if anywhere?

13        A.    He went -- if you walked -- if you stood in
14   the living room, you walked straight, there's the
15   kitchen.  You take a right.  There's a little like room
16   with the hot water tank and stuff where the stairs are
17   that goes outside.  And if you go straight, there's a
18   garage.  I don't know if he went in the garage or the
19   little room where the back door is.

20        Q.    Okay.  But Jonathan Glennon left the living
21   room where you were at that point and then went in that
22   direction?

23        A.    Yes, sir.

24        Q.    Did you ever see Thomas leave the house that

Examination of Justin Knapp

1    night?

2         A.    No, sir.

3         Q.    Okay.  Did you ever hear any voices or

4    yelling or loud noises from the garage area or any

5    other area?

6         A.    No.

7         Q.    Did Joseph Howell pay you or give you

8    anything or talk to you in any way when you were still

9    at the house?

10        A.    No.

11        Q.    Okay.  What did you do when you were there?

12        A.    I sat in the living room because I had tools

13   to sell to Joe and I had money to buy drugs, which I

14   was going to trade the tools, as well, for drugs.

15        Q.    So, what happened with the drugs and the

16   tools?

17        A.    (No response)

18        Q.    Were you able to sell the tools to Joe?

19        A.    Yeah.

20        Q.    What did he pay you in?

21        A.    Heroin and meth.

22        Q.    Okay.  And then did you do drugs that night,

23   as well?

24        A.    Yeah.

86

Examination of Justin Knapp

1          Q.    Okay.  How long were you there?

2          A.    Hour, hour and a half.

3          Q.    Okay.  At some point in time did you get a

4    ride back to Ithaca?

5          A.    Yeah.

6          Q.    Okay.  Were you high and on drugs at this

7    time, too?

8          A.    Yeah.

9          Q.    All right.  Who gave you a ride back to

10   Ithaca?

11         A.    Joe and some white dude that I never seen

12   before.

13         Q.    Okay.  Have you since learned his name or --

14         A.    No.

15         Q.    Okay.  And then where did they take you back

16   to?

17         A.    I got dropped off by the dead end by Walmart.

18         Q.    Okay.

19         A.    Which there's an entrance to the Jungle right

20   there.

21         Q.    Now, at that point in time did Joseph Howell

22   say anything to you?

23         A.    Yes.  He told me not to say anything about

24   Thomas or he'd kill me.

Examination of Justin Knapp

1      Q.   Okay.  Did you know that they were going to

2  do anything bad to Thomas that day?

3      A.   No.

4      Q.   Did you know that they were going to kill him

5  or do anything else?

6      A.   No.

7      Q.   And have you cooperated with the police?

8      A.   Yeah.

9      Q.   Provided them statements?

10     A.   Yeah.

11     Q.   And you've also entered into a cooperation

12  agreement with my office under the terms we talked

13  about earlier, is that right?

14     A.   Yeah.

15     Q.   Okay.  Did you see Colleen Dillon there at

16  the house, as well?

17     A.   Yeah.

18     Q.   How many times did Colleen Dillon go in and

19  out of the garage, if you remember?

20     A.   I don't know.  A handful, five, six.

21     Q.   Okay.  At some point in time did she come out

22  and do anything with the music?

23     A.   Yes.  She turned the radio on in the living

24  room and turned it up.

88

Examination of Justin Knapp

1      Q.   Turned it up loud?

2      A.   Yeah.

3      Q.   Did she say anything in particular at that

4 point in time when she did that?

5      A.   No.

6      Q.   Had she come out of the garage or just talked

7 to Joe at that point right when she did that?

8      A.   What, turn the music up?

9      Q.   When she turned the music up.

10     A.   I don't know.  Joe wasn't in the living room.

11     Q.   Okay.  Was he in the garage area or had gone

12 that way?

13     A.   Yeah, somewheres.

14     Q.   Okay.

15     A.   I don't know.

16     Q.   He wasn't in the living room where you were?

17     A.   No.

18     Q.   You didn't know where he was?

19     A.   No.

20     Q.   And at some point Colleen was in and out of

21 the garage four or five, a handful of times?  I can't

22 remember how you phrased it.  Is that right?

23     A.   Yeah.  A handful of times, yeah.

24     Q.   Okay.  And at some point in time she came

Examination of Justin Knapp

1   into the living room and turned the music on and turned

2   it up very loud?

3        A.   Yeah.

4        Q.   Did you ever see Thomas again?

5        A.   No.  I didn't speak to Joe after getting out

6   of the vehicle because I didn't want no part of

7   anything that was going on.

8        Q.   Okay.

9    ✳ A.   I showed up strictly at the Jungle because

10  Joe was supposed to meet me there with the drugs for my

11  money and tools because I was a heroin addict and I was

12  withdrawing.  And he said that I had to get in the

13  vehicle, that he couldn't meet me downtown.  So, that's

14  the only reason I even got in the vehicle with Thomas.

15                 MR. MARTIN:   Okay.  I have no

16             other questions for this witness.

17                 Does anybody have any questions?

18                 Yes, ma'am.

19                 A JUROR:   Was it just you and

20             Angelo that got into the car?  Was there

21             anybody else with you that you remember?

22                 THE WITNESS:   Nobody.

23             ✳ A JUROR:   Okay.  Did you see how

24             or when Thomas was handcuffed?

Examination of Justin Knapp

```
 1                        THE WITNESS:   I did not.  It
 2              happened before I arrived.
 3                        MR. MARTIN:   Anything else?
 4                        (Whereupon there was no response
 5              from the grand jurors)
 6                        MR. MARTIN:   Okay.  Thank you,
 7              Mr. Knapp.
 8                        (Whereupon the witness was excused)
 9                        MR. MARTIN:   We are going to break
10              for lunch.  I'll ask you to be back at 1:00.
11              It's about 15 minutes before noon now, I
12              believe.
13                        (Whereupon a lunch break was taken)
14                        MR. MARTIN:   The people call
15              Robert Hines.
16                        (Whereupon Grand Jury Exhibit 40
17              was marked for identification)
18                             - - - - -
19
20
21
22
23
24
```

Exhibit #3

GENL-19 REV (04/08) VOLUNTARY STATEMENT

# NEW YORK STATE POLICE

## VOLUNTARY STATEMENT

**COUNTY OF**   TOMKINS

**TOWN OF**   DRYDEN

**STATEMENT START TIME:** 8:26   ☐ AM ☐ PM

**DATED:**   AUGUST 3, 2023

I, ROBERT HINES, AGE: 52 AND BORN ON: 11/14/70, AND RESIDING AT: 76 BUSH RD, WILSEYVILLE, NY, HAVE BEEN ADVISED BY: INV BAMBINO, OF THE NEW YORK STATE POLICE, OF THE FOLLOWING:

I HAVE THE RIGHT TO REMAIN SILENT AND I DO NOT HAVE TO MAKE ANY STATEMENT IF I DO NOT WANT TO.

IF I GIVE UP THAT RIGHT, ANYTHING I DO SAY CAN AND WILL BE USED AGAINST ME IN A COURT OF LAW.

I HAVE THE RIGHT TO HAVE A LAWYER PRESENT BEFORE MAKING ANY STATEMENT OR AT ANY TIME DURING THIS STATEMENT.

IF I SHOULD DECIDE THAT I DO WANT A LAWYER AND CANNOT AFFORD TO HIRE ONE, A LAWYER WILL BE APPOINTED FOR ME FREE OF CHARGE AND I MAY HAVE THAT LAWYER PRESENT BEFORE MAKING ANY STATEMENT.

I ALSO UNDERSTAND THAT I HAVE THE RIGHT TO STOP AT ANY TIME DURING THIS STATEMENT AND REMAIN SILENT AND HAVE A LAWYER PRESENT.

I FULLY UNDERSTAND THESE RIGHTS AND AT THIS TIME, I AGREE TO GIVE UP MY RIGHTS AND MAKE THE FOLLOWING STATEMENT;

_____
**WITNESS**

_____
ROBERT HINES

PAGE 1 OF PAGES

GENL-19 REV (04/08) VOLUNTARY STATEMENT

On May 16th 2023 I had gone to 70 Benjamin Hill Road in Newfield NY to mow a yard for a man named Joseph Howell. I met Joseph Howell fairly recently through my stepdaughter Christine Linderberry and my friend DJ Maycumber. Joseph Howell was moving into 70 Benjamin Hill Road, with his girlfriend Colleen Dillon, and he needed someone to mow the yard so Joe hired me. I mowed Joe's yard on the 16th and he paid me 30 dollars in cash. I did not really know Joe very well at this point.

A few days after this, I am not exactly sure of the date, I picked up Christine Linderberry at my ex wife Elizabeth's apartment at the Cedar Creek Apartments in Ithaca. Christine had called Tammy Sue Gingerich, my girlfriend, and told me that she was fighting with Elizabeth. Christine always calls Tammy to get ahold of me because I do not have a phone and do not carry one. I picked Christine up from Cedar Creek at around 10AM on this day. I had Christine with me while I ran various errands throughout the day, like mowing the lawn, going to the scrapyard, and things like that. During these errands I went to Steve Park's house in Brooktondale to get some parts I needed for my truck. I was on fairly good terms with Steve Park and I knew he had the parts I needed. I had called him earlier on Christine's phone and he said to come on over. When we got to Steve's house he flipped out on me and pulled out a silver revolver and pointed it at us and told us to leave. I do not know why he did this or what his problem was but I got mad and started to get out of the car. Christine tried to calm me down and told me Steve would actually shoot me so we left.

While we were driving around later, maybe at around 6 or 7 PM, Christine got a call. I do not know who called her but after she got off the phone she told me that we had to go see Joe Howell at his house. I didn't know what this was about but I was not in any hurry to get over there and Christine knows not to rush me to do anything. I went to the Meadowcourt Inn in Ithaca and picked up Tammy because she works there. I brought Tammy to our home at 76 Bush Rd in Willseyville. I stayed at our house for a bit, I may have had something to eat (I don't recall exactly) and then I went with Christine up to Joe Howell's house to see what he wanted. My truck is a red 2002 Dodge Ram.

Christine and I got to 70 Benjamin Hill Rd between 10 and 11 PM. There were two cars in the driveway, a BMW and a Saturn, and Christine and I got out and went inside the house. Inside the house there were several people that I know, and a few that I didn't. The people I know were Joe Howell, Colleen Dillon, myself, Christine, Johnny (I am not sure of his last name), and Angelo (I am not sure of his last name either). I know Johnny through Christine and I don't know much about him except that Tammy told me he was at our house with Christine once while I was out. I also know that Johnny is always either coming to the area from Binghamton NY or heading to Binghamton but that's all I know about him. Johnny is a tall skinny white male but I never really paid attention to him much and he always has a hoodie on so I don't have a good description of him. I have only met him maybe twice.

Angelo is a short stocky Hispanic male that is bald. I know Angelo because he was down in the "Jungle" area in Ithaca when my cousin, Frederick Hines, lived down there. Angelo and I have known each other for a few years now and I'd say we are kind of friends.

Like I said before there were other people at the house that I did not know but I can't recall what they looked like. I only know there were maybe 3 or 4 of them. Angelo and Johnny said they needed a ride and Angelo said "whenever you're ready we can go". Angelo and Johnny left the house and went to my truck. I left the house a minute or tow after them and they were already in the truck. I had stayed in the house for a moment because Joe Howell got $20 and gave it to me to pay for gas. When I got in the truck, Angelo was in the front passenger seat, Johnny sat behind me, and there was another male sitting in the back seat behind Angelo. I don't know this male but he was a was a tall skinny white male in a dark hoodie and dark pants and he appeared to be in his late 20's maybe. I did not ask questions and Johnny said that we needed to go to the gravel yard in Brooktondale, which I know is near Steve Park's house.

While we were driving to the gravel yard, the male I did not know kept saying things like "Just let me go and I won't tell anyone". Angelo and Johnny did not respond but I got uncomfortable at this point and kept wondering what the hell Christine got me into.

PAGE 2 OF 5 PAGES

GENL-19 REV (04/08) VOLUNTARY STATEMENT



I drove to the gravel yard in Brooktondale near Steve Park's house and I stopped the truck at the gravel yard before the stop sign. Johnny got out of my truck with the male I did not know and he told the male to walk. At this point I saw that Johnny was holding a shotgun but I did not know he had that with him during the drive. At this point I was very nervous about what was happening but I did not know what to do, and Johnny was armed so I didn't think I could drive away. Johnny started telling the other male to walk and they walked towards Steve Park's house while Angelo and I were in the truck. Johnny and the male got just past the stop sign right near Steve's house and then the light in Steve's house came on. It must have sketched out Johnny and the other male because they started coming back towards the truck. While they were coming back to the truck the male with Johnny looked like he fell in a woodchuck hole or something because he fell and started yelling. Johnny got the other male to his feet and I heard Johnny tell the other male to get to "shut up and get in the truck". Johnny was shoving the male with the barrel of the shotgun and got him back into the truck. Johnny got in the truck and told me to find a spot so I just started driving because I was freaked out because Johnny was behind me with a gun so I didn't feel that I had a choice.

I asked them where they wanted to go and if we were going back to Ithaca and Johny and Angelo said no. They said that we couldn't go back to Ithaca until we drop the other male off. I did not know what was going on and Johnny just told me to keep driving so I did. I just kept driving with no intended specific location and Angelo and Johnny told me to find a spot to drop him off. I asked Angelo and Johnny if, once we dropped off the male, we could head back and they said yes. They told me we were just dropping him off and that's all.

At this point I had driven Ekroos Rd, which is a remote road at about the Tompkins and Tioga county line. I drove up Ekroos Rd to the point where there is a straight section of road and a pulloff on the right side of the road. When I got to this point, Angelo and Johnny told me to stop the truck. I asked Johnny and Angelo "He's good right? He's gonna walk?" and Angelo told me "Yeah, he's gonna walk". Johnny did not say anything.

After I stopped the truck, Johnny got out of the truck with the shotgun, then Angelo got out of the truck, and then the other male got out. I saw that Johnny had the shotgun but I didn't think he was going to use it. Johnny went around the back of the truck to the passenger side of and I stayed in the truck, Angelo stayed near the the passenger side door and Johnny took the male out of the back seat. I asked Johnny and Angelo "We're good right? He's gonna walk from here?" and they told me "No, he's gotta go". When the male heard this he started to run towards the ditch on the passenger side of the vehicle. The male barely made it to the ditch when I heard a gunshot and the male fell down. I am not sure but I think he may have been shot in the leg. I am familiar with guns and I have owned multiple shotguns and I know that the first gunshot I heard was not a shotgun. I looked in the side mirror and I saw Johnny holding what appeared to be a silver semi-auto handgun. After this first shot, Johnny took a few steps towards the male and shot him several more times with the handgun, I am not sure how many times. After this happened Johnny put the handgun away and then brought up the shotgun and shot the male twice with it. The shotgun was black in color with a full stock and I believe it was a pump action. Johnny shot the male twice with the shotgun, I do not know where the first shot hit but second shot hit the male in the head and completely destroyed his head. After this, Johnny and Angelo started looking around trying to pick up the casings using flashlights. I couldn't believe what happened and I yelled at them telling them they were fucked up and they did not respond. Johnny and Angelo then got in the truck and told me to drive. Angelo and Johnny told me to just leave the male where the was but I told them I couldn't just leave him in the ditch. I felt that he should at least be buried with some dignity.

I got out of the truck and started to move the male's body out of the ditch so I could come back and bury it. Angelo and Johnny kept telling me to just leave it and I ignored them. I dragged the body into the woods and laid the body at the base of a tree. The body was intact except for the head. I did not have a shovel so I knew that I could not bury him at that moment and I would have to come back. I then went back to my truck and I left with Angelo and Johnny. I drove Angelo and Johnny back to 70 Benjamin Hill Rd and dropped them off and picked Christine up. Nobody said a word the entire time.

I took Christine back to Cedar Creek Apartments to her mother's and then I went home to Bush Rd.

PAGE 3 OF 5 PAGES

Exhibit # 3

GENL-19 REV (04/08) VOLUNTARY STATEMENT

When I got back home I got a little bit of sleep as best as I could and then I got up in the daylight. I grabbed a shovel with a wooden handle and brought it back to the spot where I placed the body. Before I did this (I am not exactly sure, I saw that there was a phone in the back of my truck. I don't know whose phone it was but I did not want it in my truck so I brought the phone to 70 Benjamin Hill Rd. Joe Howell and Colleen Dillon were there and I think Johnny was there too. I put the phone on the table and I told them someone left it in my truck and I left.

Anyway, I got the shovel from my house and returned to where I had left the body. I buried the body at the base of the tree. I tried to dig a deep hole but I eventually hit a tree root and had to stop. I then buried the body as best as I was able to. I know this whole thing took a long time because it was starting to get dark when I finished.

After all if this happened I did not know what to do, I did not tell anyone what happened, not even Tammy. I was extremely upset and hurting on the inside over what I saw and what I did, I just did my best to hold it in. What Johnny and Angelo did was bad, it was fuck up, and I wouldn't wish it on anyone. I feel bad for what I did, I know it was wrong to move his body, but I didn't know what else to do.

Maybe a month after this all happened, maybe less, the police started coming around asking questions about a missing person and I had seen the press release for the missing person, Thomas Rath. When I saw the picture of Thomas I felt horrible and I kept feeling like a bad person because I knew what happened. After police started asking people questions, Christine came to me and started accusing me of running my mouth even though I wasn't. Christine told me that I was going to get our family hurt if I told the police anything. She did not say who would hurt them but I knew she meant Joe Howell, I could read between the lines.

I have been holding the knowledge of Thomas' death in for month and it has caused me a lot of pain inside. Earlier today I was brought to the State Trooper Barracks in Freeville after I was arrested for driving without a licence. I spoke with Investigators and while I was speaking with them I couldn't hold it in any longer and I told Investigator Schweiger about what happened and what I did. I then took the Investigators to the spot where I buried Thomas.

People don't get me to say sorry very often but I am sorry for what I did. I am sorry this happened and I am sorry for the part I played in all of this. Thomas' family deserves some closure. I have read this statement, understand it, and it is true and accurate to the best of my knowledge and recollection. -
*(END OF STATEMENT)*

NOTICE **Penal Law § 210.45** — IN A WRITTEN INSTRUMENT, ANY PERSON WHO KNOWINGLY MAKES A FALSE STATEMENT WHICH SUCH PERSON DOES NOT BELIEVE TO BE TRUE HAS COMMITTED A CRIME UNDER THE LAWS OF THE STATE OF NEW YORK PUNISHABLE AS A CLASS A MISDEMEANOR.

AFFIRMED UNDER PENALTY OF PERJURY

This ___3rd___ day of ___AUGUST,___ 20 _23_

OR

SUBSCRIBED AND SWORN TO BEFORE ME

This _3rd_ day of ___August MONTH,___ 20 _23_

SIGNATURE OF DEPONENT,

SIGNATURE OF WITNESS

EXhibit #3

GENL-19 REV (04/08)  VOLUNTARY STATEMENT

STATEMENT END TIME: __11:19__ ☐ AM ☒ PM

107

Examination of Robert Hines

1    Q.    And then what happened?
2    A.    They both met me in the truck.  All three of
3    them was already in the truck when I came out.
4    Q.    All right.  So, did you leave the residence
5    after having that conversation with --    *If I was in the
                                                Truck, How did I
6    A.    Yes.                                 have the conversation
7    Q.    -- Joe and Angelo?                   with Him? Joe
8    A.    Yes.
9    Q.    You walked to your truck.  Was your truck
10   parked in the driveway?  *There is no driveway
                               To the house.
11   A.    Yes.
12   Q.    Okay.  And when you walked out to your truck,
13   who was in the truck, if you remember, and where were
14   they seated?
15   A.    Angelo was in the front seat.  Don -- John
16   was in the middle of the back, and then Jason or
17   Jonathan Rath was by the door.
18   Q.    Okay.  Thomas Rath?
19   A.    Yes.
20   Q.    Okay.  So, did you know that that was Thomas
21   Rath at that point in time?
22   A.    No.
23   Q.    You found that out later?
24   A.    Yes.

Examination of Robert Hines

1      Q.   And so, why was Jonathan or Johnny in the

2  middle of the back seat as opposed to one of the

3  outboard seats of the back area of the truck?

4      A.   Because the back seat on my side was full

5  with tools.

6      Q.   Okay.  At that point in time did you see any

7  guns on anybody?

8      A.   No.

9      Q.   Okay.  Did you have any guns on you at that

10  time?

11      A.   No.

12      Q.   Now, how was the person that you later came

13  to know or came to find out was Mr. Rath, how was he

14  dressed at that point?

15      A.   He had a hoody on, sweats.

16      Q.   Sorry?

17      A.   He had a hoody on and sweats.

18      Q.   Okay.  This is?  What time of day or night is

19  this, do you remember, approximately?

20      A.   Night.

21      Q.   Okay.  Could you see any details or injuries

22  or --

23      A.   No.

24      Q.   -- on Mr. Rath at that point?

109

Examination of Robert Hines

1        A.    No.

2        Q.    Okay.  And was he already in the truck when

3  you got out to the truck to --

4        A.    Yes.

5        Q.    Were you in the driver's seat?

6        A.    Yes.

7        Q.    Okay.  And then after you got in the truck,

8  were you directed to go someplace?

9        A.    Yeah.  Said, let's go towards Brooktondale to

10  Steve's house.

11        Q.    Okay.  Is that Steve Parks?

12        A.    Yes.

13        Q.    And did you drive over to Steve Parks' house?

14        A.    Yes.

15        Q.    Okay.  And now, what happened at Steve Parks'

16  house?

17        A.    I parked up the road, and John and Rath got

18  out and started walking down there.

19        Q.    Okay.  What happened to Mr. Rath during this

20  time?

21        A.    The light came on and spooked them, and they

22  headed back towards the truck.

23        Q.    Did Mr. Rath start yelling at any point in

24  time?

110

Examination of Robert Hines

1        A.    Yeah.   Because he fell in a woodchuck hole.

2        Q.    Okay.   You said he fell in a woodchuck hole.

3    Did he fall down?

4        A.    Not that I recall.

5        Q.    Say again.

6        A.    Not that I recall.

7        Q.    Okay.   Well, why do you say that he fell in a

8    woodchuck hole?

9        A.    Because he hollered.

10       Q.    Okay.

11       A.    He said, ow.

12       Q.    Okay.   So, he was hollering at some point in

13   time?

14       A.    Yes.

15       Q.    Did either Glennon or Baez get out of the

16   truck?

17       A.    Glennon was already out of the truck.

18       Q.    And did you see Glennon with a gun at any

19   point?

20       A.    Yes.

21       Q.    What kind of gun?

22       A.    A shotgun.

23       Q.    Okay.   And then what did he do when Rath

24   started yelling?

Examination of Robert Hines

1       A.    He rushed him back to the truck with it.

2       Q.    Did they both get back into the truck?

3       A.    Yes.

4       Q.    Now, at that point in time, did you then

5 drive to a different location?

6       A.    Yes.

7       Q.    Okay.  Before you got to the other location,

8 did you hear Thomas Rath say anything on the trip?

9       A.    He said, just let me go, and I won't say a

10 word.

11      Q.    Okay.  And how many times do you recall him

12 saying that?

13      A.    Twice.

14      Q.    Just let me go, and I won't say a word?

15      A.    Mm-mm.

16      Q.    What about Mr. Baez or Mr. Glennon?  How did

17 you decide where to go next after Steven Parks' place?

18      A.    We went on back roads away from houses to let

19 him go.  All right.  We'll do that.

20      Q.    Okay.

21      A.    That's how we ended up on Ekroos Road.

22      Q.    Okay.  And Ekroos Road, you said Ekroos Road?

23      A.    Mm-mm.

24      Q.    Okay.  And is that a road off of Honeypot?

Examination of Robert Hines

1      A.    Yes.

2          Q.    Now, is that a road that you were familiar

3    with?

4          A.    Yeah.

5          Q.    So, eventually, you're driving on Ekroos

6    Road.  How are you traveling?

7          A.    East to west.

8          Q.    Ekroos Road?  East to west?

9          A.    (Nods head)

10         Q.    So, does Ekroos Road go east to west,

11   generally speaking?

12         A.    No.  It goes north and south, I do believe.

13         Q.    Okay.  Now, at some point in time were you

14   asked to stop the truck?

15         A.    Yeah.

16         Q.    Who asked you?

17         A.    Angelo.

18         Q.    Okay.  And so, what were his words, his sum

19   and substance of his words?

20         A.    Stop, and this looks like a good place to let

21   him out.

22         Q.    Okay.  And had you become concerned about

23   Mr. Rath's safety at that point?

24         A.    Not -- not at the time.  I thought they were

Examination of Robert Hines

1   just going to let him go.

2                   MR. MARTIN:   Okay.  Let me just

3              say that as a cautionary instruction, the

4              comments that Mr. Baez was relying to

5              Mr. Hines should be used just solely for the

6              purpose of describing what Mr. Hines did

7              next as the driver of the vehicle.

8        Q.   Now, did you stop?

9        A.   Yes.

10       Q.   Did you say something to Baez and Glennon or

11   anybody else in the truck?

12       A.   Yes.  I said, we were just going to let him

13   go.

14       Q.   What did they say?

15       A.   Yes.

16       Q.   Okay.  What happened next?

17       A.   And then it all went after that (indicating).

18       Q.   So, your moving--

19       A.   It went crazy.

20       Q.   -- your hands, though, but you have to -- you

21   have to tell the grand jury specifically what happened.

22       A.   They shot him after that.

23       Q.   So, did Mr. Rath get out of the truck?

24       A.   Yes.

114

Examination of Robert Hines

1       Q.   And what did he do?

2       A.   They shot him.

3       Q.   Okay.

4       A.   And he started to run in the ditch.  He tried

5 running in the ditch, and they shot him.

6       Q.   Okay.  The truck was on Ekroos Road?

7       A.   Yes.

8       Q.   Were you on the road?

9       A.   Yes.

10      Q.   And so, did they get out of the passenger

11 side or the driver's side?

12      A.   Passenger.

13      Q.   Okay.  And so, Mr. Rath got out?

14      A.   (Nods head)

15      Q.   And then you said he tried to run?

16      A.   Yes.

17      Q.   And they shot him?

18      A.   Yes.

19      Q.   Who shot him?

20      A.   Both of them.

21      Q.   Were you in the truck or out of the truck?

22      A.   I was in the truck.

23      Q.   Still in the driver's seat?

24      A.   Yes.

115

Examination of Robert Hines

1     Q.    Did you see them shoot him --

2     A.    Yes.

3     Q.    -- or -- and how did you see them shoot him?

4     A.    In the mirror.

5     Q.    What mirror?

6     A.    Passenger and the rear-view.

7     Q.    Okay.  And were you able to see any guns at

8     that point in time that either of them were holding?

9     A.    Yes.

10    Q.    Describe those guns.

11    A.    Handguns.

12    Q.    Okay.  What color?

13    A.    Silver in color.

14    Q.    Okay.  Who was holding the silver-colored

15    one, if you recall?

16    A.    I want to say they both had a silver one.

17    Q.    Okay.  They were both handguns?

18    A.    Yes.

19    Q.    And did you see any other handguns other than

20    those two, the one that Baez was holding and the one

21    that Glennon was holding?

22    A.    No.

23    Q.    Okay.  Now, after they shot him, what

24    happened next?

Examination of Robert Hines

1    A.    I started to leave.  They were in the truck.

2   I started to leave and I said, I can't do that.  I got

3   out and drug him across the road, put him next to a

4   tree and then went back and buried him.

5        Q.    Okay.  You're skipping around a lot.  So, at

6   some point in time do Baez and Glennon get back in the

7   truck with you?

8        A.    Yes.

9        Q.    And then you start to drive?

10       A.    Yes.

11       Q.    How far do you drive?

12       A.    About five feet.

13       Q.    And then what did you do?

14       A.    Jumped out and drug him across the road.

15       Q.    Okay.  You drag him across the road.  And

16   then did Mr. Glennon get out of the truck at that point

17   in time?

18       A.    Yes.

19       Q.    And did he have a gun with him at that point?

20       A.    Yes.

21       Q.    What kind of gun did he have?

22       A.    He had a 12-gauge.

23       Q.    Okay.  So, then --

24       A.    12, 20.  I know it was a shotgun.

Examination of Robert Hines

1    Q.   You know it was a shotgun.  And then you

2    dragged Mr. Rath across the road and to a tree or next

3    to -- you left him next to a tree?

4         A.   Yes.

5         Q.   What did Mr. Glennon do?

6         A.   Shot him.

7         Q.   Do you know where he shot him?

8         A.   In the head.

9         Q.   Okay.  With a shotgun?

10        A.   Yes.

11        Q.   And then what happened?

12        A.   He jumped back in the truck, and we left.

13        Q.   Okay.  And where did you go after that?

14        A.   Dropped him off on 70 Benjamin Hill Road.

15        Q.   You took Angelo Baez and Jonathan Glennon

16   back to 70 --

17        A.   Yes.

18        Q.   -- Benjamin Hill Road?

19        A.   Yep.

20        Q.   Okay.  Did you know that that's what they

21   were going to do that night?

22        A.   No.

23        Q.   Did you know Thomas before then?

24        A.   No.

Examination of Robert Hines

1       Q.   Did you know anything about what had occurred

2   to Thomas prior to that moment in time?

3       A.   No.

4       Q.   And did you eventually cooperate with the

5   police?

6       A.   Yes.

7       Q.   Well, let me ask you this:  The following day

8   did you go back up to that scene?

9       A.   Yes.

10      Q.   What did you do?

11      A.   I buried him.

12      Q.   Why did you do that?

13      A.   I thought it was the right thing to do.

14      Q.   Okay.  At some point in time did you

15   cooperate with the police and then take them up to the

16   location?

17      A.   Yes.

18      Q.   And tell them everything that happened?

19      A.   Yes.

20      Q.   And you were arrested as a result of all

21   that, right?

22      A.   Yes.  I'm here.

23                MR. MARTIN:  All right.  I have no

24             other questions for Mr. Hines.

Examination of Robert Hines


1                        Does anybody have any questions?

2                        A JUROR:   I just have one.

3              Mr. Hines, was he -- was Thomas handcuffed

4              when he was in your vehicle?

5                        THE WITNESS:   I do not recall.

6                        A JUROR:   Okay.

7    BY MR. MARTIN:

8         Q.   Was he in the back seat the entire time when

9    he was in your vehicle --

10        A.   Yes.

11        Q.   -- except for the times that he was out?

12        A.   Yes.

13                       MR. MARTIN:   Yes, ma'am.

14                       A JUROR:   Did you notice if he had

15             handcuffs on when you were moving his body

16             after he had been shot?

17                       THE WITNESS:   He didn't have no

18             handcuffs on.

19                       A JUROR:   And then, also, did the

20             two men threaten you with their guns after

21             getting out of your car and moving the body?

22                       THE WITNESS:   No.

23   BY MR. MARTIN:

24        Q.   Were you ever threatened at any point in

1    time --

2         A.   No.

3         Q.   -- after this?  Were you ever paid anything?

4         A.   No.

5                        MR. MARTIN:   Okay.  Anybody have

6              any other questions?

7                        (Whereupon there was no response

8              from the grand jurors)

9                        MR. MARTIN:   Okay.  Thank you,

10             Mr. Hines.

11                       THE WITNESS:   You're welcome.

12                       MR. MARTIN:   You're all set.

13                       (Whereupon the witness was excused)

14                       MR. MARTIN:   Before we call the

15             next witness, we have to take a break, and

16             the reason is the jail is short staffed.

17             They have to take one back, and they'll be

18             back with other people, okay.

19                       So, it's going to be a few minutes,

20             maybe a 15-minute break, and then let's get

21             back in here, and we'll see where we're at.

22                       (Whereupon a short break was taken)

23                       MR. MARTIN:   All right.  The

24             people call Brelynn Vorrasi.

EXHIBIT # 5

**STATE OF NEW YORK**
**LOCAL CRIMINAL COURT**

**COUNTY OF TIOGA**
**TOWN OF CANDOR**

| THE PEOPLE OF THE STATE OF NEW YORK | | **FELONY COMPLAINT** |
|---|---|---|
| -- vs. -- | | |
| ANGELO BAEZ | 6/5/1975 DOB | |
| | Defendant | |

**ACCUSATION,** BE IT KNOWN THAT, by this Felony Complaint, Investigator Andrew Tocheny stationed at New York State Police – Ithaca, NY, accuses **ANGELO BAEZ**, the above mentioned Defendant, with having committed the FELONY OF MURDER 2ND, in violation of Section 125.25, subsection 1 of the PENAL LAW of the State of New York.

**FACTS**

On or about the 21st day of May, 2023 in the Town of Candor, County of Tioga, said defendant did unlawfully commit the felony of Murder in the Second Degree.

A person is guilty of Murder in the Second Degree when:

1. With intent to cause the death of another person, he causes the death of such person or of a third person; except that in any prosecution under this subdivision, it is an affirmative defense that:

(a) The defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be. Nothing contained in this paragraph shall constitute a defense

to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime; or

(b) The defendant's conduct consisted of causing or aiding, without the use of duress or deception, another person to commit suicide. Nothing contained in this paragraph shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the second degree or any other crime.

**TO WIT:** on the aforementioned time, date and place said defendant did, individually and while acting in concert with others, intentionally cause the death of Thomas Rath, by shooting him with a handgun and shotgun.

The above allegations of fact are made by the complainant herein upon information and belief, with the sources of Complainant's information and the grounds for belief being the facts contained in a New York State Police investigation.

**WHEREFORE,** Complainant requests that an Arrest Warrant be issued for the arrest of the said Defendant.

**IN A WRITEN INSTRUMENT, ANY PERSON WHO KNOWINGLY MAKES A FALSE STATEMENT WHICH SUCH PERSON DOES NOT BELIEVE TO BE TRUE HAS COMMITTED A CRIME UNDER THE LAWS OF THE STATE OF NEW YORK PUNISHABLE AS A CLASS A MISDEMEANOR (PL §210.45).**

AFFIRMED UNDER PENALTY OF PERJURY
THIS **21** DAY OF AUGUST, 2023

**RECEIVED**

AUG 23, 2023

6JD TIOGA CAP

ANDREW TOCHENY
INVESTIGATOR
NEW YORK STATE POLICE

EXhibit #5

**STATE OF NEW YORK**
**LOCAL CRIMINAL COURT**

**COUNTY OF TIOGA**
**TOWN OF CANDOR**

| THE PEOPLE OF THE STATE OF NEW YORK | | **FELONY COMPLAINT** |
|---|---|---|
| — vs. — | | |
| **ANGELO BAEZ** | 6/5/1975 DOB | |
| | Defendant | |

**ACCUSATION,** BE IT KNOWN THAT, by this Felony Complaint, Investigator Andrew Tocheny stationed at New York State Police – Major Crimes Unit, Sidney, NY, accuses **ANGELO BAEZ**, the above mentioned Defendant, with having committed the FELONY of Kidnapping in the 1st Degree, in violation of Section 135.25, subsection 3 of the PENAL LAW of the State of New York.

**FACTS**

On or about the 20th day of May, 2023 in the Town of Candor, County of Tioga, said defendant did unlawfully commit the felony of Kidnapping in the First Degree.

A person is guilty of Kidnapping in the First Degree when he abducts another person and when:

3. The person abducted dies during the abduction or before he is able to return or to be returned to safety.

**TO WIT:** on the aforementioned time, date and place said defendant did, individually and while acting in concert with others, abduct Thomas Rath, in the City of Ithaca and during the abduction Thomas Rath was murdered in the Town of Candor, County of Tioga, before he was able to return or to be returned to safety.

The above allegations of fact are made by the complainant herein upon information and belief, with the sources of Complainant's information and the grounds for belief being the facts contained in a New York State Police investigation.

**WHEREFORE,** Complainant requests that an Arrest Warrant be issued for the arrest of the said Defendant.

IN A WRITEN INSTRUMENT, ANY PERSON WHO KNOWINGLY MAKES A FALSE STATEMENT WHICH SUCH PERSON DOES NOT BELIEVE TO BE TRUE HAS COMMITTED A CRIME UNDER THE LAWS OF THE STATE OF NEW YORK PUNISHABLE AS A CLASS A MISDEMEANOR (PL §210.45).

AFFIRMED UNDER PENALTY OF PERJURY
THIS 28 DAY OF AUGUST, 2023

ANDREW TOCHENY
INVESTIGATOR
NEW YORK STATE POLICE

RECEIVED

AUG 2 3, 2023

6JD TIOGA CAP

# – Table of Contents –

- Cover sheet
- Complaint form
- Plaintiffs information
- Defendants information
- Statement of facts
- Statement of Claims
- Exhibit #1
- Exhibit #2
- Exhibit #3
- Exhibit #4
- Exhibit #5

provided by local ... either ... required by law, except as
purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Angelo Baez

(b) County of Residence of First Listed Plaintiff **TOMPkins**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

(c) Attorneys *(Firm Name, Address, and Telephone Number)*

**DEFENDANTS** City of Ithoca NY police
Department officers & the Tioga
county District atterny's Office

County of Residence of First Listed Defendant **Tompkins**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

[X] 1 U.S. Government Plaintiff
[ ] 3 Federal Question *(U.S. Government Not a Party)*
[ ] 2 U.S. Government Defendant
[ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

(form checkbox listings for CONTRACT, TORTS, FORFEITURE/PENALTY, BANKRUPTCY, OTHER STATUTES, etc.) — [X] 550 Civil Rights

## V. ORIGIN *(Place an "X" in One Box Only)*
[X] 1 Original Proceeding
[ ] 2 Removed from State Court
[ ] 3 Remanded from Appellate Court
[ ] 4 Reinstated or Reopened
[ ] 5 Transferred from Another District *(specify)*
[ ] 6 Multidistrict Litigation - Transfer
[ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*
42 U.S.C 1983
Brief description of cause:
Malicious prosecution, failur to intervene, false arrest Ext.

## VII. REQUESTED IN COMPLAINT:
[ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $ $1 Million
CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):* JUDGE _____ DOCKET NUMBER _____

DATE _____ SIGNATURE OF ATTORNEY OF RECORD _____

### FOR OFFICE USE ONLY
RECEIPT # ____ AMOUNT ____ APPLYING IFP ____ JUDGE ____ MAG. JUDGE ____